UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARIEL DAN BARKAI,

                            Plaintiff,

            v.

GEORGE MENDEZ, *et al.*,

                            Defendants.

No. 21-CV-4050 (KMK)

OPINION & ORDER

Appearances:

Ariel Dan Barkai
Nyack, NY
*Pro Se Plaintiff*

John Martin Flannery, Esq.
Eliza Mae Scheibel, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Ariel Dan Barkai ("Plaintiff"), proceeding pro se, brings this Action, pursuant to 42

U.S.C. § 1983 ("§ 1983"), against Clarkstown Police Department ("CPD") Police Officer ("PO")

George Mendez ("Mendez"), CPD Sergeant Alice Laschet ("Laschet"), CPD Chief of Police Ray

McCallugh ("McCallugh"), CPD Captain Jeff Wannamaker ("Wannamaker"), CPD Lieutenant

Glenn Cummings ("Cummings"; with Mendez, Laschet, McCallugh, and Wannamaker, "Initial

Defendants"), CPD PO Thomas O'Connell ("O'Connell"), CPD PO Arthur Noeldechen

("Neoldechen"), CPD PO Connor Golden ("Golden"), and CPD PO Dean Domenici

("Domenici"; with O'Connell, Neoldechen, and Golden, "Former John Doe Defendants";

collectively, "Defendants"), alleging that Defendants violated his constitutional rights by, inter

alia, taking Plaintiff into custody upon executing a mental health check pursuant to New York

law. (*See generally* Am. Compl. (Dkt. No. 68); *Id.* Ex. 1 ("AC Fact Addendum") (Dkt. No. 68-

1); *Id.* Ex. 2 (Dkt. No. 68-2).)  Before the Court is Defendants' Motion To Dismiss the Amended

Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Not. of

Mot. (Dkt. No. 32).) [1, 2]

    For the reasons stated herein, the Motion is denied in part and granted in part.

----

[1] Plaintiff's initial complaint did not include Former John Doe Defendants.  (*See* Mot. To Amend (Dkt. No. 16); *see also* Defs.' Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 5 n.2 (Dkt. No. 34).)  Plaintiff moved to amend the complaint on October 7, 2021, to include Former John Doe Defendants.  (*See* Dkt. No. 16.)  The Court granted this motion five days later.  (*See* Dkt. No. 17.)  Plaintiff did not initially file an amended complaint.  (*See generally* Dkt.; *see also* Dkt. Nos. 66, 68, 70.)  Defendants' counsel, who at first represented only Initial Defendants before Former John Doe Defendants were named and served, timely filed the instant Motion.  Accordingly, Former John Doe Defendants did not initially join the Motion. (*See* Defs.' Mem. 5 n.2.)
    To preserve judicial economy, the Court ordered Plaintiff to file an amended complaint, naming Former John Doe Defendants, as initially sought in his motion to amend.  (*See* Dkt. No. 66.)  In the same Order, the Court directed defense counsel to inform the Court, subject to Plaintiff's refiling, if they would be representing Former John Doe Defendants and, if so, whether Former John Doe Defendants would join the instant Motion and, again if so, whether they request supplemental briefing.  (*See id.*)  Defense counsel subsequently appeared on behalf of Domeneci, Golden, and O'Connell, joining the instant Motion, and declining to request supplemental briefing.  (*See* Dkt. Nos. 75, 76.)  Defense counsel further explained that they could not reach Noeldechen in light of his military service, requesting extra time to do so and obtain his answer to those questions.  (*See* Letter from Eliza Scheibel, Esq., to Court (June 13, 2022) 1 (Dkt. No. 77).)  The Court granted counsel additional time by which to obtain an answer. (*See* Dkt. No. 78.)  Subsequently, defense counsel confirmed representation of Noeldechen and stated he was both joining the instant Motion and did not request additional briefing.  (*See* Dkt. No. 81.)

    [2] Nine days prior to Defendants' Motion, Plaintiff again moved to file an amended complaint adding the Town of Clarkstown as a Defendant.  (Dkt. No. 29.)  Prior to the Court's ruling, Plaintiff made yet another motion to "relinquish [his] claims against the Town of Clarkstown and any claims to Due Process violations" and to "ask that [Defense Counsel] inform George Hoehmann that he has been withdrawn as a defendant[.]"  (Mot. to Withdraw Partial Claims 4–5 (Dkt. No. 42).)  The Court granted the latter motion, (Dkt. No. 47), thereby mooting Plaintiff's second motion to amend and proactively dismissing all claims against Hoehmann. Nonetheless, in light of Plaintiff's pro se status, the Court reviews all claims below.

# I.  Background

## A.  Materials Considered

As a threshold matter, the Court must determine the proper treatment of a number of exhibits attached to the pleadings as well as Defendants' and Plaintiff's motion papers. Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).  Nevertheless, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on a Rule 12(b)(6) motion to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." (alteration omitted) (quoting *Saimels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))). "Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'" *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

First, Plaintiff attaches three documents, titled Appendices, to the Complaint: 1) a Clarkstown Police Report filed by Mendez, (*see* Compl. Ex. 1, at 1–3); 2) a Notice of Claim letter, (*see id.* at 4–9); and 3) a certificate of disposition in the case *State of New York v. Ariel Barkai*, (*see id.* at 10–11). Because these documents are attached to the Complaint, they are squarely within the Court's purview at this juncture. *Hu*, 927 F.3d at 88 ("In deciding a Rule 12(b)(6) motion, the court may consider . . . documents attached as exhibits . . . ." (quotation marks omitted)).[3, 4]

The Court turns next to whether it may consider various three recordings submitted by the Parties: (1) a partial recording of Plaintiff's interaction with Mendez, (*see* Letter from Plaintiff to Court (Apr. 29, 2022) Ex. 1); and (2) a recording of Plaintiff's call to the Clarkstown Police, which itself is split down into two portions: (a) Plaintiff's initial discussion with a Clarkstown Police Dispatcher, (*see* Decl. of Eliza Scheibel ("Scheibel Decl.") (Dkt. No. 33) Ex. 2 (Aff. of Sgt. Brian Gorsky) ("Gorsky Aff.") (Dkt. No. 33-2) Ex. B)); and (b) Plaintiff's interaction with Sergeant Laschet, (*see* Gorsky Aff. Ex. C).

"Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2007)

---

[3] These documents were attached only to the original Complaint, not to the Amended Complaint. However, considering Plaintiff's pro se status and the fact that the substance of the Complaint and Amended Complaint are nearly identical, the Court will interpret Plaintiff's failure to attach them to the Amended Complaint as inadvertent error and view them as having been attached to the Amended Complaint, too.

[4] Notably, the Police Report was also filed as an exhibit to Plaintiff's Opposition. (*See* Pl.'s Opp. to Mot. to Dismiss ("Pl.'s Mem.") Ex. 1 (Dkt. No. 43-1).) However, because it was already attached to the Complaint, the Court need not repeat this analysis to consider the report.

(emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

When specific interactions give rise to claims, recordings thereof are often deemed integral to the complaint. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 808 F. Supp. 2d 634, 636 n.4 (S.D.N.Y. 2011) ("[B]ecause [the defendant's] unauthorized audio recording of the call, submitted in support of its motion to dismiss, is 'integral' to the complaint, I may consider both in ruling on the motion to dismiss without converting it to one for summary judgment."). This is particularly true where the claims at issue are brought under § 1983. *See Stepanian v. City of New York*, No. 15-CV-1943, 2015 WL 5350801, at *3 (E.D.N.Y. Sept. 14, 2015) (considering a videotape recording of an interaction where the interaction, the plaintiff alleged, gave rise to a § 1983 violation when adjudicating a motion to dismiss); *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 498 n.1 (S.D.N.Y. 2013) (considering video footage showing an interaction that gave rise to a § 1983 claim in deciding a motion to dismiss where the footage was referenced in the complaint); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 374 & n.1 (S.D.N.Y. 2013) (considering "video recordings of the incident [the use of deadly force, giving rise to a § 1983 claim], as they are integral to the Complaint and were relied on heavily in drafting it"); *cf. Garcia v. Does*, 779 F.3d 84, 87 & n.2 (2d Cir. 2015) (considering videos of protests submitted by both parties—upon mutual consent—during which class plaintiffs were

arrested and subsequently filed a collective § 1983 action, ruling that the recordings were incorporated into the complaint on a motion to dismiss).

Moreover, the argument that such exhibits are integral and thus to be considered is stronger where the exhibits are quoted at length in a plaintiff's submissions—either the complaint or the memorandum of law.  *See Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 910 n.3 (2d Cir. 1988) (holding that the magistrate judge was authorized to treat a letter as incorporated by reference into complaint when, inter alia, plaintiffs "quote[d] the entire text of the [l]etter" in a memorandum of law); *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204, 2021 WL 3077469, at *5 n.4 (S.D.N.Y. July 19, 2021) ("These conference call transcripts are clearly integral to [the] [p]laintiff's [a]mended [c]omplaint here, given that [the] [p]laintiff heavily relies on and quotes many statements made by [certain defendants on the call] in the [a]mended [c]omplaint for both of their claims.  [The] [p]laintiff also did not object to [the] [d]efendants citing these transcripts in their memorandum of law supporting their motion to dismiss.").

Returning to this Action, these recordings are overtly referenced and/or quoted extensively by both Parties, and particularly by Plaintiff.  (*See* AC Fact Addendum, § III, ¶¶ 9–12 (discussing the phone call with Laschet, including quoting certain portions thereof); Defs.' Mem. 2–5 (same); Pl.'s Mem. 6–10 (quoting excerpts of the same phone call and providing context to Plaintiff's interpretation of his own words); Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply Mem.") 2–3 (Dkt. No. 53) (quoting phrases from Plaintiff's phone call with Laschet as well as Plaintiff's interaction with Mendez); Pl.'s Sur-Reply In Opp. of Mot. ("Pl.'s

Sur-Reply.") 4–5 (Dkt. No. 57) (discussing and quoting portions of his phone call with

Laschet).)[5]

Considering the applicable precedent as well as the degree to which the Parties, and

particularly Plaintiff, rely upon and/or directly quote the recordings, the Court deems each of

these recordings incorporated by reference, *Hu*, 927 F.3d at 88, and/or integral, *DiFolco*, 622

F.3d at 111, to the AC and thus within the Court's consideration at this stage.

B.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are assumed to

be true for the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit

Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per

curiam).

1. Plaintiff's Traffic Stop

In January 2020, Plaintiff's mother passed away as the result of a medical mistake at

Montefiore Nyack Hospital ("MNH").  (AC Fact Addendum ¶ 1.)  Plaintiff, who was present at

the time of the mistake, made a number of vociferous complaints to individuals at MNH, which

resulted in criminal charges against Plaintiff.  (*See id*.)  The charges were "later dismissed."  (*Id.*)

While driving on the New York State Thruway, Plaintiff missed a phone call from his

lawyer.  (*See id.*)  Plaintiff then called his attorney back "once [he] got off the Thruway and was

in the left lane pulling into the adjacent . . . parking lot . . . ."  (*Id.*)

Upon pulling off the Thruway, Plaintiff was stopped by a "Clarkstown Police mobile

unit."  (*See id.* ¶ 2.)  Plaintiff "pulled over without incident to a safe spot in the parking lot,

_____

[5] When citing to the AC Fact Addendum, the Court references § III—which includes all
of Plaintiff's substantive factual allegations in numbered paragraphs—unless stating otherwise.

turned off the engine[,] and kept [his] hands in plain sight." (*Id.*)  Mendez exited the police vehicle and, "without wearing a mask," approached Plaintiff's car.  (*Id.*)  Plaintiff spoke to Mendez "through [his] window," explaining his situation and hoping Mendez would "give [him] a break" in light of the circumstances.  (*Id.*)

Plaintiff alleges that, while still unmasked and thus "shockingly and inexplicably with gross negligence and no consideration of [Plaintiff's] health and well[-]being," Mendez walked up to Plaintiff's car to retrieve Plaintiff's license, then returned to his police vehicle.  (*Id.* ¶ 4.)  Plaintiff alleges that Mendez then returned to Plaintiff's car, still unmasked, to issue Plaintiff a ticket.  (*See id.* ¶¶ 4–5.)

In response, Plaintiff "became visibly upset" and told Mendez that Mendez was wrong to issue the ticket and "risk [Plaintiff's] life."  (*Id.* ¶ 6 (quotation marks omitted).)  Plaintiff concedes amidst these allegations that he "was extremely paranoid about corona virus [sic]" in light of his mother's passing from a "microscopic organism," particularly because he did not have close family or friends nearby to care for him were something to go awry.  (*Id.*)  Mendez "did not care" and simply "got in his car and drove away."  (*Id.* ¶ 7.)  Moreover, Plaintiff alleges that his behavior during this interaction was sufficiently rational and calm such that he did not alert anyone as to his mental state.  (*See id.*)

### 2.  Plaintiff's Call to Complain About Mendez

Once Mendez left, Plaintiff drove across the parking lot to retrieve food, then went to an "adjacent empty parking lot where [he] was totally alone" and "called the Clarkstown Police Department" to complain about Mendez's failure to comply with relevant masking rules issued by then-Governor Cuomo.  (*Id.* ¶ 8.)  Upon calling, Plaintiff spoke to Laschet and expressed his wish to file a civilian complaint against Mendez.  (*See id.* ¶ 9.)  While on the phone, Plaintiff

"was extremely upset and extremely animated." (*Id.*)  To that end, during the call, Plaintiff said the following of Mendez: "He just risked my life—might as well stick a gun in my mouth." (Gorsky Aff. Ex. C ("Laschet Call"), at 2:11–2:14.)[6]  Plaintiff asserts that this statement—as well as any others sounding in this octave—"was not a threat" but was instead "hyperbole . . . to make the point that . . . Mendez was essentially playing Russian roulette with [Plaintiff's] life." (AC Fact Addendum ¶ 11.)

Plaintiff alleges that because "Laschet heard the words 'gun in my mouth,'" she dispatched multiple police officers to Plaintiff's location. (*Id.* ¶ 12.)  Furthermore, Plaintiff alleges that Laschet failed to clarify whether this was hyperbole or whether Plaintiff indeed had a weapon, instead informing the dispatched officers only that Plaintiff stated he had a firearm in his mouth. (*See id.*)

### 3.  Police Reaction to Plaintiff's Call

When officers arrived, Plaintiff "maintained discipline," having "put [his] phone down and [his] hands on the wheel." (*Id.* ¶ 14.)  Plaintiff states that the police "dragged [him] from [his] car," "threw [him] against the front of [his] car, physically manhandling [him] though [he] complied with their directives, frisked [him] and placed [him] in handcuffs.  At no time did [Plaintiff] resist." (*Id.*)  During this time, the police searched Plaintiff's vehicle. (*See id.* ¶ 15.)

---

[6] Plaintiff asserts that the call sounds as follows: "He could have killed me. *He* might as well have stuck a gun in my mouth." (AC Fact Addendum ¶ 10 (emphasis added).)  But "when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting the plaintiffs' "characteriz[ation of] their behavior toward the [arresting] officers as cordial" because "audio recording show[ed] indisputably that they were neither courteous nor compliant").  Having listened to the recording, the Court is confident that Plaintiff stated a different prefatory clause and that Plaintiff did not include the second article "He."  Rather, the call should thus be transcribed as follows: "He just risked my life—might as well stick a gun in my mouth." (Laschet Call 2:11–2:14.)  Nonetheless, as explained below, this semantic distinction does not bear on the Court's holding.

Throughout the search, Plaintiff alleges, "several officers were not wearing masks[,] putting [his] life further at danger by multiplying [his] contact with potential virus spreaders." (*Id.* ¶ 14.)

Having completed the search, during which police officers "found no gun or illegal paraphernalia that would lend them to believe [Plaintiff] was engaged in any activity that would give rise to probable cause that [he] posed 'a substantial risk of harm to [him]self or anyone else.'" (*Id.* at ¶ 15.) Plaintiff also notes that he "could not have posed a risk to anyone else as there was nobody within 100 feet." (*Id.*) Plaintiff alleges that he was in handcuffs "for at least 30 minutes including in the back of a police cruiser with the windows up as if purposely attempting to suffocate [him]." (*Id.* ¶ 16.) And while in handcuffs, "a young officer . . . reminded [Plaintiff] that he had been at [Plaintiff's] house a few months prior when a similar false claim was made against [Plaintiff]," during which Plaintiff's suicidal ideations were also a concern. (*Id.*)

Additionally, while the search of Plaintiff's car was ongoing, the officers "tried to track down one social worker from the Behavioral health Response Team but were unsuccessful." (*Id.* ¶ 18.) Having been unable to do so, Plaintiff alleges, the officers "took [Plaintiff] without [his] consent to Good Samaritan Hospital to a Psyche [sic] Ward Holding Cell where after two hours it was determined that [he] was not a risk to anyone and [he] was released." (*Id.* ¶ 20.) Plaintiff states that he was then later billed several thousand dollars for the visit, though the hospital rescinded the bill following the State Attorney General's interdiction. (*See id.*) Finally, Plaintiff avers that the officers lacked "body cameras or dashboard cameras." (*Id.* ¶ 19.)

### 4.  Plaintiff's Reaction to the Events

Following Plaintiff's release, Plaintiff allegedly "called Laschet and thanked her . . . ." (*Id.* ¶ 21.) Plaintiff then "filed a civilian complaint into the incident." (*Id.* ¶ 22.) After doing so,

Plaintiff was "contacted by Lieutenant Chernick" ("Chernick"), and he told Chernick that he "appreciated [Chernick's] reaching out." (*Id.*)  Moreover, Plaintiff said that Chernick's simple "action of reaching out made [Plaintiff] consider the matter closed because [he] assumed [the CPD] would force their officers to comply with the law and to wear a mask and [he] really did not want anymore [sic] problems with the police." (*Id.*)

Despite this statement, Plaintiff alleges that when his driving offense—informally referred to by Plaintiff as "operating a hand[-]held device while driving a motor vehicle"—went to trial, Mendez "perjured himself." (*Id.* ¶ 23.)  Per Plaintiff, Mendez admitted in a deposition to not wearing a mask but also stated that "[a]t no time did [he] approach [Plaintiff] in less than 6 feet." (*Id.* ¶ 24.)  Plaintiff asserts that Mendez's testimony is "against the laws of physical nature," meaning Mendez "knowingly and willingly perjured himself on his police report and under sworn testimony." (*Id.* ¶ 25.)

Plaintiff therefore went to the Clarkstown Police Department headquarters and "filed a sworn criminal complaint." (*Id.* ¶ 26.)  Plaintiff alleges that nothing came of the complaint, despite having "tried for months to contact [] Wannamaker and [] McCallugh," both of whom "refused to intervene or to discuss this matter with [Plaintiff] in anyway [sic]." (*Id.*)  Plaintiff then filed a Notice of Claim and continued to try to speak with Wannamaker and McCallugh but "received no response." (*Id.* ¶ 27.)

Following Plaintiff's attempted outreach, Plaintiff received a call from Cummings regarding a separate matter. (*See id.*)  Plaintiff alleges that Cummings "tried to white wash the investigation by sending [Plaintiff] some document from the NY State [Department of Health] on Officer Protocol for protecting themselves during a pandemic and wearing a mask but never

spoke to an officer[']s obligation to protect other people. . . ."  (*Id.*)  "Having received no reply" to these additional overtures, Plaintiff filed the instant Action.  (*Id.* ¶ 28.)

Plaintiff alleges that, as a result of the underlying passing of his mother as well as Defendants' conduct in this Action, Plaintiff has suffered numerous injuries.  Specifically, Plaintiff states that he has required therapy, was barred from securing an Economic Injury Disaster Loan from the Small Business Administration, and, more broadly, has "lost all faith in policing and society as a whole."  (*Id.* § IV.)  And given how strong he feels this fear, Plaintiff, in his words, "must flee his community."  (*Id.*)

Plaintiff seeks actual damages in the amount of $100,000 and punitive damages in the amount of $400,000.  (*See id*. § V.)[7]

C.  Procedural Background

Plaintiff filed his Complaint on May 4, 2021, (Dkt. No. 2), and his request to proceed in forma pauperis was granted on May 12, 2021, (Dkt. No. 5).  Plaintiff moved to amend the complaint on October 7, 2021, to include the Former John Doe Defendants.  (*See* Dkt. No. 16.) The Court granted this motion five days later.  (*See* Dkt. No. 17.)  Plaintiff did not initially do so. (*See generally* Dkt.; *see also* Dkt. Nos. 66, 68, 70.)

Instead, on December 6, 2021, Plaintiff moved to consolidate this Action with another case filed against other government officials, *Barkai v. Nuendorf*, No. 21-CV-4060 (S.D.N.Y.). (*See* Dkt. No. 23.)  In light of pertinent concerns regarding the timeliness of motions in the

---

[7] Plaintiff named several forms of equitable relief sought in his initial complaint but has seemingly removed them from his amended complaint.  (*Compare* Compl. § V, *with* AC Fact Addendum § V.)  Because "[i]t is well established that an amended complaint . . . supersedes the original and renders it of no legal effect," *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)), the Court need not consider such forms of relief.

respective actions, the fear of juror confusion, undue discovery burdens, and several important differences in the conduct at issue underlying the claims, the Court denied the motion to consolidate. (*See* Dkt. No. 28.)

On January 1, 2022, Plaintiff filed another motion to amend his complaint by naming the Town of Clarkstown. (*See* Dkt. No. 29.) Before the Court ruled on this second motion to amend, Plaintiff again moved to "relinquish [his] claims against the Town of Clarkstown and any claims to Due Process violations" and to "ask that [Defense Counsel] inform George Hoehmann that he has been withdrawn as a defendant[.]" (Mot. to Withdraw Partial Claims 4–5 (Dkt. No. 42).) The Court granted the latter motion, mooting Plaintiff's second motion to amend and dismissing all claims against Hoehmann. (*See* Dkt. No. 47.)

Defendants filed the instant Motion on January 10, 2022. (Not. of Mot.; Scheibel Decl.; Defs.' Mem.) On January 25, 2022, Plaintiff submitted a Response. (Pl.'s Mem.)[8] On February 24, 2022, Defendants submitted a Reply. (Defs.' Reply Mem.) That day, Plaintiff moved to file a Sur-Reply. (Dkt. No. 54.) With the Court's permission, (Dkt. No. 56), Plaintiff filed his Sur-Reply, (Pl.'s Sur-Reply).

On January 13, 2022, Plaintiff separately moved to subpoena evidence and to submit evidence. (Dkt. Nos. 38, 39.) On February 8, 2022, these motions were respectively denied without prejudice and granted. (Dkt. Nos. 44, 45.)

On February 14, 2022, Plaintiff filed a letter informing the Court that it would have the evidence to be submitted sent to the Court. (Dkt. No. 49.) Defendants moved to compel the

---

[8] Plaintiff had previously moved to submit a reply brief exceeding the Court's individual rules regarding page limits, which requires the Court's express permission. (*See* Dkt. No. 40.) Plaintiff submitted this brief without the Court's consent in violation of its rules. *See* Indiv. Rules, II.B.

production of said evidence the following day, (Dkt. No. 50), and ultimately confirmed that Plaintiff produced this evidence via email, (Dkt. No. 61).

On May 31, 2022, the Court ordered Plaintiff to file an amended complaint within seven days to include Former John Doe Defendants.  (Dkt. No. 66.)  The Order also directed defense counsel to inform the Court, subject to Plaintiff's refiling, if they will be representing Former John Doe Defendants.  (*See id*.)  If so, the Court ordered, counsel was also to state whether Former John Doe Defendants would join the instant Motion and, again if so, whether they request supplemental briefing.  (*See id.*)  Defense counsel subsequently appeared on behalf of the Domeneci, Golden, and O'Connell, joining the instant Motion, and declining to request supplemental motion.  (*See* Dkt. Nos. 75, 76.)  On July 8, 2022, defense counsel confirmed they would be representing Noeldechen and stated he was both joining the instant Motion and did not request additional briefing.  (*See* Dkt. No. 81.)

## II.  Discussion

### A.  Standard of Review

#### 1.  Motion To Dismiss

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d

306, 317 (S.D.N.Y. 2016) (same).  But when a plaintiff proceeds pro se, the Court may consider

"materials outside the complaint to the extent that they are consistent with the allegations in the

complaint."  *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y.

Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to

his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y.

Dec. 15, 2010) (italics omitted).  Moreover, where, as here, a plaintiff proceeds pro se, the Court

must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments

that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks

omitted).  Notwithstanding a standard of review comparatively more lenient and favorable to pro

se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules

of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013)

(quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir.

2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules

and to comply with them." (italics and citation omitted)).

### 2.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (internal quotation marks omitted).  Qualified immunity shields a defendant from

standing trial or facing other burdens of litigation "if either (a) the defendant's action did not

violate clearly established law, or (b) it was objectively reasonable for the defendant to believe

that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Thus, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . . 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576

17

(2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32).  "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint."  *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)).  As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  *Id.* at 436 (internal quotation marks omitted).

   B.  Analysis

   Plaintiff asserts a number of claims arising from the actions in the chronology of events described above, including violations of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.  (*See generally* AC Fact Addendum.)  The Court begins by reviewing Plaintiff's allegations regarding certain individuals to determine the sufficiency of their involvement; thereafter, the Court reviews each claim in the order it chronologically arose as well as the arguments thereabout.

       1.  Personal Involvement

   Defendants argue that Plaintiff "fails to allege personal participation in any constitutional violation by . . . Cummings, Wannamaker, [and] McCullagh . . . ."  (Defs.' Mem. 23.)  The Court interprets Defendants' argument as applying with equal force to Former John Doe Defendants, as they were not named in Complaint and thus not named in motions practice.

       a.  Applicable Law

   "It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal

involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit "held that 'there is no special rule for supervisory liability[,]' thereby doing away with 'the special standards for supervisory liability' . . . and clarifying that 'a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *32 (S.D.N.Y. Mar. 26, 2021) (internal quotation marks omitted) (quoting *Tangreti*, 983 F.3d at 617, 618). Therefore, even with respect to supervisors, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Additionally, "[i]t is well-settled that '[w]here a complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.'" *Smith v. New York City Dep't of Educ.*, No. 18-CV-8545, 2019 WL 6307471, at *5 (S.D.N.Y. Nov. 25, 2019) (quoting *Suarez v. New York City Dep't of Human Res. Admin.*, No. 09-CV-8417, 2011 WL 1405041, at *3 (S.D.N.Y. Mar. 24, 2011)); *see also Al-Haj v. Akuamoah*, No. 19-CV-6072, 2021 WL 964211, at *5 (S.D.N.Y. Mar. 15, 2021) ("Where . . . a plaintiff names a defendant in the caption, but the complaint contains no substantive allegation against the

defendant, dismissal of the complaint is appropriate." (quoting *Rahman v. Schriro*, 22 F. Supp. 3d 305, 317 (S.D.N.Y. 2014))).

b.  Application

i.  Cummings, Wannamaker, and McCullagh

Plaintiff's allegations against Cummings are comprised entirely of the fact that Cummings called Plaintiff following a different emergency call and provided "some document from the NY State [Department of Health] on Officer Protocol for protecting themselves during a pandemic and wearing a mask but never spoke to an officer[']s obligation to protect other people . . . ."  (AC Fact Addendum ¶ 27.)  In other words, "[w]holly absent from Plaintiff's submissions are any allegations establishing how [Cummings] was personally involved in the alleged constitutional violations."  *Porter v. Toulon*, No. 21-CV-4037, 2021 WL 6065745, at *3 (E.D.N.Y. Dec. 21, 2021).

The same is true with respect to Wannamaker and McCallugh.  Plaintiff alleges only that he *tried* to speak to both Wannamaker and McCallugh, saying his attempts carried on "for months," including calling "'100 times.'"  (AC Fact Addendum ¶¶ 26, 27.)  However, Plaintiff is also very clear that Wannamaker and McCallugh "refused to intervene or to discuss this matter with [Plaintiff] in anyway."  (*Id.* ¶ 26; *see also id.* ¶ 27 (asserting that Plaintiff "received no response" from either Wannamaker or McCallugh following additional overtures).)  In other words, Plaintiff does not allege that either of these high-ranking police officials actively partook in the alleged constitutional violations, but instead "had some at most tangential connection with the events giving rise to [Plaintiff's] claims, and does not support a finding that they were personally involved in the alleged violations of [Plaintiff's] constitutional rights."  *Reynolds v. Barrett*, 741 F. Supp. 2d 416, 442 (W.D.N.Y. 2010), *aff'd*, 685 F.3d 193 (2d Cir. 2012)

20

(dismissing § 1983 claims against defendants named in a complaint where the allegations levied against those defendants were "tangential" to the thrust of the constitutional violation alleged). This alone is merits dismissal of Plaintiff's claims against Cummings, Wannamaker, and McCallugh. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quotation marks omitted)).

To the extent that Plaintiff alleges their involvement in their capacity as supervisors—as construed liberally by the Court pursuant to its duty in adjudicating a pro se pleading, *see Sykes*, 723 F.3d at 403—Plaintiff's allegations still fall short.

The Court is unaware of any case since *Tangreti* where a Plaintiff alleged involvement by supervisor police officials unresponsive to a citizen's complaint, nor have the Parties pointed to such precedent. However, in analogous situations—namely inmates accusing supervisor corrections officials of constitutional violations occurring in the correctional facility—courts in the Second Circuit have held both pre- and post-*Tangreti* that "receipt by a supervisory official of a letter [or a complaint] . . . , without more, has been insufficient to establish [an] official's personal involvement in a § 1983 constitutional claim." *Braxton v. Bruen*, No. 17-CV-1346, 2021 WL 4950257, at *6 (N.D.N.Y. Oct. 25, 2021); *see also Loving v. Morton*, No. 20-CV-11135, 2022 WL 2971989, at *5–6 (S.D.N.Y. July 27, 2022) (collecting cases); *Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("That [the defendant] failed to act on [the] [p]laintiff's [or others' analogous] complaints . . . cannot support the inference that [he], through '[his] own individual actions, [has] violated the Constitution.'" (quoting *Tangreti*, 983 F.3d at 615)); *Houston v. Schiriro*, No. 11-CV-7374, 2014 WL 6694468,

at *15 (S.D.N.Y. Nov. 26, 2014) ("[R]eceipt of a grievance does not constitute personal involvement."); *Walker v. Pataro*, No. 99-CV-4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official . . . receives . . . similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable . . . . Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability."). And, prior to *Tangretti*, where a plaintiff has failed to allege a police supervisor was aware of, let alone participated in, constitutional violations, such claims against the supervisor have been dismissed. *See, e.g., Gantt v. Ferrara*, No. 15-CV-7661, 2018 WL 4636991, at *7 (S.D.N.Y. Sept. 27, 2018) (dismissing a claim against a police chief for lack of involvement where "[the] [p]laintiff provides no detail of . . . other complaints [of similar misconduct], such as when they were filed and whether the alleged misconduct was similar, nor does he suggest that [the defendant] himself actually had information about these lawsuits"). The Court sees no reason to lower pleading standards when *Tangreti* has done just the opposite.

Beyond failing on the merits to plead their involvement, Plaintiff, in both his Opposition and his Sur-Reply, fails to discuss Defendants' argument in any way. Indeed, Plaintiff fails to even name these three individuals. (*See generally* Pl.'s Mem.; Pl.'s Sur-Reply.) Thus, beyond the merits of Defendants' arguments, Plaintiff has effectively conceded Defendants' argument, and thus the Court grants Defendants' Motion with respect to these four Defendants. *See P.C.R. v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778, 2022 WL 337072, at *22 (S.D.N.Y. Feb. 4,

2022) ("Courts routinely hold that where a plaintiff 'fails to address [the] defendants' arguments against or even mention several of [his or her] claims,' those claims are deemed 'abandoned.'" (quoting *Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 & n.65 (S.D.N.Y. Sept. 30, 2009)); *Scott v. JPMorgan Chase & Co.*, No. 13-CV-646, 2014 WL 338753, at *2 (S.D.N.Y. Jan. 30, 2014) (holding that when a party's "[m]emorandum of [l]aw does not respond to [an] argument, [the party] effectively concedes these arguments by [its] failure to respond to them." (citation omitted)).  Thus, Defendants' Motion with respect to Cummings, Wannamaker, and McCallugh is granted, and such claims are dismissed.[9]

### ii.  Former John Doe Defendants

As noted above, when faced with a pro se plaintiff's complaint, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (alterations and quotation marks omitted).  But while the Court is "obligated to draw the most favorable inferences" that the complaint supports, it "cannot invent factual allegations that [the plaintiff] has not pled." *Id.*; *see also Debellis v. Soloman*, No. 19-CV-8730, 2022 WL 902635, at *3 (S.D.N.Y. Mar. 28, 2022) (relying on *Chavis* to adopt the same rule); *Pratt v. City of New York*, 929 F. Supp. 2d 314, 317 (S.D.N.Y. 2013) (same); *Barnes v. Pozzi*, No. 10-CV-2554, 2012 WL 3155073 at *1 (S.D.N.Y. Aug. 3, 2012) (same); *Benavides v. Grier*, No. 09-CV-8600, 2011 WL 43521, at *1 (S.D.N.Y. Jan. 6, 2011) (same).  This limitation on a court's leniency includes barring the Court from inferring

---

[9] The Court previously granted Plaintiff's request to withdraw claims against Hoehmann following Defendants' Motion.  (*See* Dkt. No. 47.)  Plaintiff's claims would have nonetheless been dismissed pursuant to abandonment doctrine, as Defendants included Hoehmann in their motion papers under this line of argument because they were filed prior to Plaintiff's motion to withdraw the claims.  (*See* Defs.' Mem. 23–24.)

which defendants were involved in what conduct.  In other words, the Court cannot presume who was and who was not involved in Plaintiff's seizure and transport to Good Samaritan Hospital.

Though Plaintiff moved to amend the Complaint and add the identified Former John Doe Defendants, (*see* Dkt. No. 16), Plaintiff added these individuals only in the case caption, (*compare generally* Compl. *with* AC Fact Addendum).  In other words, "[a]lthough [he] names them as [P]arties, [Plaintiff] does not allege any facts regarding [Former John Doe] Defendants in [his] complaint."  *Bernheim v. N.Y.C. Dep't of Educ.*, No. 19-CV-9723, 2020 WL 3865119, at *5 (S.D.N.Y. July 9, 2020), *report and recommendation adopted*, 2020 WL 4383503 (S.D.N.Y. July 31, 2020).  Nor does Plaintiff mention any Former John Doe Defendant in his motion papers, wherein, due to Plaintiff's status as a pro se litigant, the Court would be able to consider these new allegations.  *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion.").

Accordingly, claims against Former John Doe Defendants are dismissed.[10]

### 2.  Sixth Amendment Claim

Plaintiff asserts a Sixth Amendment claim arising from Mendez's allegedly perjurious statement regarding the distance he maintained with Plaintiff during the traffic stop.  (*See* AC Fact Addendum ¶ 25.)  Defendants argue that Mendez's allegedly false claim does not give rise to a Sixth Amendment violation because Plaintiff's complaint "does not allege that [] Mendez

---

[10] Should Plaintiff choose to file another amended complaint following this Opinion & Order, *cf. infra* III, and Former John Doe Defendants are in fact the officers that responded alongside Mendez, Plaintiff must explicitly discuss the nature of their involvement to survive subsequent motions practice.

lied about the material elements of Plaintiff's traffic violation (i.e., his use of a phone while driving)."  (Defs.' Mem. 23.)

### a.  Applicable Law

"[W]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (alteration omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "[F]air trial claims based on fabrication of information [are restricted] to those cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  Therefore, "[i]n order to succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must prove by a preponderance of the evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision."  *Id.* at 279–80.  In other words, "fabrication alone is insufficient to constitute a constitutional violation."  *Snead v. City of New York*, 463 F. Supp. 3d 386, 392 (S.D.N.Y. 2020), *reconsideration denied sub nom. Snead v. LoBianco*, 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

### b.  Application

There can be no genuine argument that Mendez is not an "investigating official," thereby satisfying the first *Garnett* factor.  *Garnett*, 838 F.3d at 279.  Plaintiff has also adequately pled a

violation of the second *Garnett* factor, namely alleging that Mendez fabricated the distance between him and Plaintiff during the traffic stop.  (*See* AC Fact Addendum ¶¶ 23–25.)[11]  So, too, is it clear that Plaintiff has adequately pled the fourth and fifth *Garnett* factors insofar as Mendez's report was allegedly used in Plaintiff's prosecution and had a deleterious legal consequence in the form of his prosecution.  (*See id.*)

Plaintiff's claim falters, however, with regard to the third *Garnett* factor.  "Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case."  *Egan v. New York City*, No. 16-CV-1479, 2018 WL 4926445, at *17 (S.D.N.Y. Oct. 10, 2018) (quoting *Haskins v. City of New York*, No. 15-CV-2016, 2017 WL 3669612, at *11 (E.D.N.Y. Aug. 24, 2017)).  "[F]abricated evidence is clearly material" where "it formed the basis for" the wrongful conduct with which a government entity charged an individual.  *Jordan v. City of New York*, No. 15-CV-6364, 2017 WL 3106453, at *4 (S.D.N.Y. July 17, 2017).

At no point has either Party informed the Court of, exactly, Plaintiff's traffic charge(s).  Accordingly, it is difficult for Plaintiff to sufficiently plead that Mendez's alleged misstatement bore on Plaintiff's trial of the underlying ticket at issue, precluding Plaintiff's his Sixth Amendment claim.  *Cf. Snead*, 463 F. Supp. 3d at 393 ("The Court begins with the statute under which [the plaintiff] was charged . . . .").  The Court nonetheless recognizes that both Parties have described the allegedly illegal conduct at issue: Plaintiff's use of a phone while driving.

---

[11] To be clear, the Court does not opine on the veracity of Plaintiff's allegation, i.e. if Mendez actually lied regarding the distance maintained.  Instead, the Court holds only that Plaintiff has satisfied his pleading requirement assuming the truth of his allegations solely for the purpose of deciding the instant Motion.

(*See* AC Fact Addendum ¶¶ 1–3; Defs.' Mem. 23; Pl.'s Mem. 7 (noting that Plaintiff tells
LaShett that "he was pulled over for using his phone while driving").)

The Court may take judicial notice of state statutes.  *See Wendel v. New York*, 500 F.
Supp. 2d 172, 174 n.1 (E.D.N.Y. 2007) ("The Court takes judicial notice of the New York State
statutes discussed herein." (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d
Cir. 1998)).  Doing so in this Action, the operative New York state statute at issue is N.Y. Veh.
& Traf. Law § 1225–c(2)(a), which reads: "no person shall operate a motor vehicle upon a public
highway while using a mobile telephone to engage in a call while such vehicle is in motion."  *Id*.
The statute speaks only of the use of a phone, exceptions for emergencies, and the definitions of
specific terms in the statute.  *See generally id.* § 1225-c.  In other words, nowhere does the
statute speak of a post hoc exception on which Mendez's post-offense conduct would bear.  This,
once again, suggests that any falsehood Mendez may have told does not concern "the material
elements of Plaintiff's traffic violation," (Defs.' Mem. 23), undermining any argument that his
allegations were "material" to the prosecution.

Plaintiff attempts to sidestep this argument by asserting that he filed a so-called *Clayton*
Motion, (*see* Pl.'s Mem. 30), wherein pursuant to state law, "[a]n information, a simplified traffic
information, a prosecutor's information or a misdemeanor complaint, or any count thereof, may
be dismissed [by a state court] in the interest of justice," N.Y. Crim. Proc. Law § 170.40.[12]
"Such a motion should be granted only where a defendant has demonstrated by a preponderance
of the credible evidence that a compelling reason exists to warrant dismissal in the interest of

---

[12] The § 170.40a motion is commonly known as a *Clayton* motion in reference to *People
v. Clayton*, 342 N.Y.S.2d 106 (App. Div. 1973).  *See, e.g., People v. Stephen*, 52 N.Y.S.3d 248
(unreported), No. 16-40153, 2017 WL 123827, at *1 (N.Y. Just. Ct. 2017) (noting that a motion
made "pursuant to C.P.L. 170.40" is "commonly referred to as a *Clayton* motion" based on the
1973 Supreme Court, Appellate Division, case).

justice." *Stephen*, 2017 WL 123827, at *1.  Plaintiff argues that "the ticket should be dismissed in the interest of justice because the risk of harm to Plaintiff by Mendez actions was as bad or worse than the risk of harm of Plaintiff pulling into the parking lot to leave a voice message to an attorney." (Pl.'s Mem. 30.)

Even if a state court would have been persuaded that there existed "some compelling factor" that "require[s]" dismissal, N.Y. Crim. Proc. Law § 170.40(1), "such a dismissal is not a favorable termination," *Dallas v. Goldberg*, No. 95-CV-9076, 1997 WL 728153, at *7 & n.5 (S.D.N.Y. Nov. 20, 1997).  Rather, dismissal under § 170.40 is only "favorable to the plaintiff where the evidence concerning the circumstances surrounding the dismissal of the charges 'is such as to indicate the innocence of the accused.'"  *Id.* at *7 (quoting *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997)).  That is not the case here.  Rather, Plaintiff's allegations sound broadly in the circumstances occurring *after* the ticketed offense—namely Mendez's alleged conduct following pulling Plaintiff over—which means that Plaintiff could not argue that a hypothetical dismissal spoke to his innocence.  To the contrary, "[w]ith respect to dismissals in the interest of justice, the statute which authorizes such dismissals specifically assumes that a punishable offense has been committed . . . ."  *Davis v. N.Y.C. Police Officers*, No. 93-CV-7963, 1996 WL 54358, at *1 (S.D.N.Y. Feb. 8, 1996).  Therefore, even if a state court might have dismissed the underlying offense as a result of the false statement, Plaintiff has still failed to plausibly allege that the statement at issue was "likely to influence a jury's verdict" with respect to his guilt or innocence of the underlying ticket.  *Garnett*, 838 F.3d at 279.  Absent such an allegation, the Court must grant Defendants' dismissal of Plaintiff's Sixth Amendment claim against Mendez.[13]

---

[13] Plaintiff's Sixth Amendment claim speaks solely to Mendez's false statement.  (*See* AC Fact Addendum ¶¶ 23–25.)  Accordingly, the Court does not analyze a Sixth Amendment claim against any other named defendant.

### 3.  Equal Protection Claim

The Court interprets Plaintiff to allege that Mendez violated Plaintiff's right to equal protection insofar as he failed to wear a mask when giving Plaintiff a ticket and thereafter perjured himself.  (*See* AC Fact Addendum ¶¶ 25–26.)  Defendants assert that Plaintiff has failed to state a claim in this regard.  (*See* Defs.' Mem. 21–23.)  Moreover, Defendants argue that Plaintiff effectively abandoned his claims sounding in Equal Protection violations.  (Defs.' Reply Mem. 10.)

#### a.  Applicable Law

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from "invidious discrimination in statutory classifications and other governmental activity." *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)).  "The Equal Protection Clause [thus] requires that the government treat all similarly situated people alike."  *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  Therefore, "[t]o state a claim for an equal protection violation, [a plaintiff] must allege that a government actor intentionally discriminated against [him or her] on the basis of race, national origin or gender."  *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).  A plaintiff can plausibly allege intentional discrimination in three ways: (1) "a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender"; (2) "a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion"; or (3) "a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect."  *Id.* (citations omitted).

29

b.  Application

Plainly speaking, Plaintiff fails to allege any of these three forms of discrimination.  (*See*
*generally* AC Fact Addendum.)  "There is no allegation in the [Amended] Complaint of any
'similarly-situated' individuals who were treated differently," and "[t]o the extent that Plaintiff
may be pleading a 'class of one' equal protection claim, he also fails to mention it in the
[Amended] Complaint." *Lombardi v. Suffolk County*, No. 04-CV-1216, 2007 WL 446733, at *7
(E.D.N.Y. Feb. 7, 2007); *see also Whitt v. Buffalo Transp. Inc.*, No. 17-CV-673, 2018 WL
375844, at *2 (W.D.N.Y. Jan. 11, 2018) ("The 'liberal' construction of pro se pleadings does not
render *Twombly* and *Iqbal* toothless—where [the] [p]laintiff fails to even mention race, or
actions regarding any other protected class, his claims of . . .  discrimination . . . cannot, as
pleaded, survive dismissal.").  Accordingly, Plaintiff fails to allege an equal protection violation.

Moreover, Plaintiff has abandoned his claims.  Defendants argued at length that Plaintiff
had failed to plausibly allege a constitutional violation under the Equal Protection clause, but
Plaintiff did not remark upon this argument, let alone grapple with it, in any meaningful way.
(*See generally* Defs.' Mem.; Pl.'s Mem.)  Accordingly, it is deemed abandoned.  *See Baptiste v.*
*Griffin*, No. 18-CV-7274, 2019 WL 5635808, at *5 (S.D.N.Y. Oct. 31, 2019) ("When a plaintiff
fail[s] to address [the] [d]efendants' arguments in support of dismissing [a] claim, it is deemed
withdrawn or dismissed as abandoned." (quotation marks omitted)); *Johnson v. City of New*
*York*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) (same); *Romeo &*
*Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7
(S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . a plaintiff  abandons a claim by
failing to address the defendant's arguments in support of dismissing that claim." (citation
omitted)).

Indeed, not only does Plaintiff fail to respond to Defendants' arguments, Plaintiff also affirmatively disavows the claim calling it "nolle prosequi." (Pl.'s Mem. 30 (italics omitted).) "A nolle prosequi is a 'unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy.'" *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *Cislo v. City of Shelton*, 692 A.2d 1255, 1260 n. 9 (Conn. 1997)). Thus, notwithstanding Plaintiff's use the criminal term in the civil context, the Court sees no other conclusion than to deem the claim voluntarily abandoned and accordingly grants Defendants' Motion with respect to all claims sounding in equal protection violations.

### 4.  Fourth Amendment Claims

Defendants argue that Plaintiff's Fourth Amendment claims must be dismissed because the officers—from Laschet to those involved in the custodial confinement itself, including Mendez—had probable cause to detain Plaintiff initially in the parking lot and thereafter extend Plaintiff's confinement by transporting him to Good Samaritan Hospital. (*See* Defs.' Mem. 8–13, 15–17.) Defendants argue in the alternative that all of the officers nonetheless are entitled to qualified immunity. (*See id.* at 13–15, 17–19.)

### a.  Applicable Law

"In analyzing § 1983 claims for unconstitutional false arrest and imprisonment, federal courts look to the law of the state in which the arrest occurred—not federal law." *5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 192 (S.D.N.Y. 2010) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (applying New York false arrest law to adjudicate a false arrest claim brought pursuant to § 1983). Under New York law, a plaintiff alleging false arrest must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the

plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (citation omitted). "A confinement is privileged if probable cause existed at the time of the arrest. Thus, a claim for false arrest must fail if probable cause to arrest existed." *Martinetti v. Town of New Hartford Police Dep't*, 112 F. Supp. 2d 251, 252 (N.D.N.Y. 2000) (citations omitted), *aff'd sub nom. Martinetti v. Town of New Hartford*, 12 F. App'x 29 (2d Cir. 2001); *see also Weyant*, 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest[.]'" (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994))); *Gerasimou v. Cillis*, No. 15-CV-6892, 2022 WL 118748, at *3 (E.D.N.Y. Jan. 12, 2022) ("The existence of probable cause precludes a finding for the plaintiff on [the fourth] element; it is therefore a 'complete defense' to a false-arrest claim." (citing *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999))); *Frigerio v. United States*, No. 10-CV-9086, 2011 WL 3163330, at *8 (S.D.N.Y. July 22, 2011) ("[T]he existence of probable cause is an absolute defense to a false arrest claim." (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006))); *Decker v. Campus*, 981 F. Supp. 851, 856 (S.D.N.Y. 1997) ("If there existed probable cause at the time of the arrest, the arrest is 'privileged,' and the individual has no constitutional or statutory claim against the officer who made the arrest.").

"The [c]ourts that have addressed seizures under a state's mental hygiene or mental health laws have applied the concepts of 'probable cause' that have arisen in criminal Fourth Amendment seizure cases." *Bayne v. Provost*, No. 04-CV-44, 2005 WL 1871182, at *6 (N.D.N.Y. Aug. 4, 2005) (collecting cases from the Second Circuit, a district court therein, and other courts of appeal); *cf. Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) ("The Crisis Team took [plaintiff] to the hospital against his will, and he was involuntarily confined there pursuant

to state law.  This infringement of his liberty was tantamount to the infringement of being

arrested.  That his seizure occurred in the civil context does not render the Fourth Amendment

inapplicable.") (citations omitted).  Therefore, as it applies to this Action, if probable cause exists

as to the conditions precedent for civil confinement in N.Y. Mental Hyg. Law ("NYMHL")

§ 9.41(a) ("§ 9.41"), an individual's confinement pursuant thereto "was privileged and his . . .

claims fail as a matter of law," *Bayne*, 2005 WL 1871182, at *6.

"The question of whether or not probable cause existed may be determinable as a matter

of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may

require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted)).  By

contrast, "[w]here the question of whether an arresting officer had probable cause is

predominantly factual in nature, as where there is a dispute as to the pertinent events, the

existence *vel non* of probable cause is to be decided by the jury." *Murphy*, 118 F.3d at 947.

In the criminal context, "[p]robable cause exists when, based on the totality of

circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts

and circumstances that are sufficient to warrant a person of reasonable caution in the belief that

an offense has been or is being committed by the person to be arrested.'" *Finigan v. Marshall*,

574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)).

"Probable cause is to be assessed on an objective basis." *Zellner*, 494 F.3d at 369.  In practice,

then, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from

the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S.

146, 152 (2004).

As the language of this standard makes clear on its face, "probable cause is 'a fluid

concept . . . not readily, or even usefully, reduced to a neat set of legal rules.'" *Walczyk v. Rio*,

496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  To that

end, though probable cause demands more than "mere suspicion" of criminal wrongdoing,

*Mallory v. United States*, 354 U.S. 449, 454 (1957), the concept should be centered on

"probabilities" rather than "hard certainties," *Gates*, 462 U.S. at 231.  Thus, according to the

Supreme Court, when courts review a situation frozen in ink and perform ex post facto probable

cause analyses with the benefit of near-unlimited time, they are to think about "the factual and

practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act." *Id*. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see

also United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (same).

 Finally, probable cause can exist "even where it is based on mistaken information, so

long as the arresting officer acted reasonably and in good faith in relying on that information."

*Bernard*, 25 F.3d at 102.  Once a government official has a reasonable basis to believe that there

is probable cause to arrest, the official "is not required to explore and eliminate every

theoretically plausible claim of innocence before making an arrest. *Garcia*, 779 F.3d at 93

(citation omitted).  "In sum, probable cause does not demand any showing that a good-faith

belief be 'correct or [even] more likely true than false.'  It requires only such facts as make

wrongdoing or the discovery of evidence thereof probable." *Walczyk*, 496 F.3d at 157 (quoting

*Texas v. Brown*, 460 U.S. 730, 742 (1983)).

 Applying these same principles of probable cause to the civil confinement context, the

Court's task is to determine if the officers in this Action—namely Laschet and those who in fact

confined Plaintiff—had probable cause to believe that Plaintiff might be "mentally ill and [ ]

conducting himself in a manner [ ] likely to result in serious harm to himself or others."

NYMHL § 9.41(a).  New York law defines this as follows:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* § 9.01.

<u>b.  Application</u>

<u>i.  Laschet</u>

Plaintiff argues that the call did not create probable cause of his dangerousness using intertwined arguments steeped in the precise language Plaintiff used.  First, he forwards a semantic argument, asserting that his verbiage—particularly regarding his discussions of prior entanglements with law enforcement for suicide watch—was in the past tense, meaning that it does not give rise to probable cause to Plaintiff's dangerousness in that moment.  (*See* Pl.'s Mem. 8.)  Second, Plaintiff concedes that he used the words "gun in my mouth" but argues it was a metaphor to compare it to the dangerousness of Mendez's failure to wear a mask in the height of the pandemic and is thus a "form of protected rhetorical hyperbole."  (*Id.* at 6; *see also* Laschet Call 2:10–2:15.)  Third, Plaintiff tries to argue that the entirety of the call, including but not specifically his use of past tense verbs and beyond the firearm reference, undermines Defendants' argument regarding the existence of probable cause, as Defendants' omissions with respect to certain language in its memoranda paint an unfair picture.  (*See* Pl.'s Mem. 10.)  As these arguments are specific to the call itself, a deeper examination of the call—including words used and particular exchanges—is required.

Within 30 seconds of Plaintiff's call with Laschet, Plaintiff states that he is in "a complete state of fucking spiraling out of control shit."  (Laschet Call 0:26–0:28.)  He lays out the trauma he endured in the form of his mother's passing and discusses the ineptitude of the

government on multiple levels, which he asserts on the call caused his business to collapse, all with raised and agitated intonation.  (*See id.* at 0:28–1:06.)  Indeed, after this, Plaintiff—again in a frenzied tone of voice—states: "[T]hree times I've had Clarkstown cops at my house because" Plaintiff was "very, on the verge of suicide."  (*Id.* at 1:05–1:10; *see also* Pl.'s Mem. 8.)  Having then repeated his discussion of traumatic events and the global pandemic—another distressing factor to be sure—Plaintiff then, while complaining about Mendez, says: "He just risked my life—might as well stick a gun in my mouth."  (Laschet Call 2:11–2:14.)

After further discussions of similar complaints, Plaintiff proclaimed to Laschet that he is "on the verge of fucking a nervous breakdown" and is "in therapy for fucking suicide prevention."  (*Id.* at 3:13–3:18.)  Shortly thereafter (approximately one minute later), the following exchange also occurs:

> Plaintiff: Three times I've had Clarkstown police department at my house because I'm so fucking depressed.  My life is fucking destroyed because somebody killed my fucking mother in front of me and nobody gives a shit.
>
> Laschet: I, I do.
>
> Plaintiff: Yea, I'm sure you do, but you know what, honestly, man, I have a fucking – I'm just done.  I'm really, I'm fucking sick of everything.  I can't take it anymore. I really just can't fucking take it anymore.  I really can't take it.
>
> Laschet: Listen, I'll sit and I'll talk to you all night.  I'll be here all day.  So, if you want to talk about your mom, we'll talk about your mom.

(*Id.* at 4:45–5:10; *see also* Pl.'s Mem. 9 (referencing portions of this exchange).)

Seconds after this portion of the call, Plaintiff returns to the issue of Mendez and the cost of the traffic ticket at issue.  Again, Plaintiff notes his dire financial circumstances, yelling that he can't pay for the ticket: "All I can afford is fucking Taco Bell.  I can't – nothing, nothing ma'am, my com– is in spirals, completely out of fucking control, completely."  (Laschet Call 5:42–5:51.)  Plaintiff then laments to Laschet that his sister—a psychiatrist, Plaintiff is careful to

highlight—is paying for him to see a therapist and issued a warning to him to "take responsibility for his actions." (*Id.* at 6:03–6:05.)  Then Plaintiff tells Laschet loudly: "How the fuck can I take responsibility for the fact that Nyack Hospital overdosed my mother right in front of me, fucking traumatizing me?  How the fuck can I take responsibility for a global pandemic that wrecked my business, and I can't get anybody on the phone." (*Id.* at 6:07–6:18.)

Plaintiff returns to his business prospects—including his frustrations with recent business dealings gone awry—and his exasperation that stimulus checks have been issued to big businesses, concluding with the following ominous statement: "So I'm done, I'm done, until further notice, and nobody's done a thing to help me, nobody." (*Id.* at 7:30–7:37.)

Plaintiff thereafter reverts his attention to once again Mendez, (*see id.* at 8:01–8:15), and Laschet expresses concern once again for Plaintiff's wellbeing in the following exchange:

> Laschet: Listen, Ariel, I want to talk to you, but I'm more – Listen, I'll deal with George Mendez, I'll talk to him about that.  If you want to make a complaint, you're welcome to come here, that's fine – um – but I don't like, um, you know, you upset me when you say that, you know, you wanna hurt yourself, you're gonna shoot yourself, we're talking about your mom.
>
> Plaintiff: I'm in therapy, I've got a therapist.
>
> Laschet: No, I know you're in therapy.
>
> Plaintiff: [Unintelligible] two weeks ago.  It was just two weeks ago.  It's not like, you know, this is something that happened ten years ago.  Look, here comes the cops, here they are, alright.
>
> Laschet: Well, I asked them to come and meet with you because I'd like to talk to you.

(*Id.* at 8:16–8:51.)  Laschet states that the officers were there to talk to him and "make sure [he] is okay." (*Id.* at 9:00–9:04.)  Laschet reiterates that point mere seconds later, stating that she is worried he is "very upset," (*id.* at 9:33–9:38), when additional officers have arrived and begin speaking to Plaintiff.

Plainly, the undisputed, recorded language Plaintiff used is disturbing and is reasonably interpreted to imply Plaintiff's consideration of self-harm.  Plaintiff consistently reiterates his prior—and recent—concerns of suicide and preventative measures such as therapy and law enforcement visits.  Plaintiff also repeatedly cites several different sources of trauma that are apparently crashing down on him simultaneously: witnessing his mother's death at the hands of an apparent medical mistake, the filing of wrongful—and devastating—criminal charges against him, his dire economic circumstances, and the "unprecedented" difficulties brought by the Covid-19 pandemic.  And, contrary to Plaintiff's argument, much of Plaintiff's language—which he himself references in his briefing—is in the present tense: "My life *is* f\*\*cking destroyed"; "*I'm* just done"; "*I'm* really, I'm fucking sick of everything"; "I *can't* take it anymore"; "I really just *can't* fucking take it anymore"; "I really *can't* take it"; "So *I'm* done, *I'm* done[.]"  (Pl.'s Mem. 9 (first alteration in original) (emphases added); *see also* Laschet Call 3:52–5:03.)  It also bears mentioning that Plaintiff responded to Laschet's concern of shooting himself with a pronouncement that he's in therapy.  (Laschet Call 8:16–8:51.)  Anything other than protesting that conclusion could suffice to raise a concern of self-harm by any reasonable individual.  The Court highlights, too, its agreement with Defendants that Plaintiff spoke with "a rapid, agitated tone," adding further credence to a finding of probable cause.  (Defs.' Mem. 12.)  In short, the Plaintiff's actions and call give rise to multiple sources of concern for the "reasonable and prudent m[a]n," *Gates*, 462 U.S. at 231 (citation and quotation marks omitted).  To say this is anything other than "conduct demonstrating that the person is dangerous to himself," NYMHL § 9.01, would be to ignore the truth.  Moreover, holding otherwise—and allowing such claims to continue—could create a perverse chilling effect on such law enforcement officers from initiating a mental health check when genuinely concerned for one's safety.

38

Finally, Plaintiff's protestations regarding his own personal state of mind in the moment, (*see* Pl.'s Mem. 8), are of no moment.  Where the standard is an objective one, "an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior."  *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *cf. Graham v. Connor*, 490 U.S. 386, 388, 396 (1989) (holding that the standard for determining whether excessive force was used in making an arrest is an "objective reasonableness" test, which "must be judged from the perspective of a reasonable officer on the scene"); *Aponte v. Kanbur*, No. 20-624, 2021 WL 3854069, at *5 (2d Cir. Aug. 30, 2021) (summary order) (noting that in § 1983 actions, "the arrestee's subjective belief regarding the situation . . . [is] simply irrelevant" to the analysis).  Indeed, even if the Court were to adopt Plaintiff's interpretation of his statement regarding a proverbial gun in his mouth, (Pl.'s Mem. 8–10), the Court would nonetheless find that probable cause existed in light of the remaining aspects of the call, which Plaintiff does not dispute.  *See Hicks v. City of New York*, No. 12-CV-5081, 2015 WL 5774575, at *6 (E.D.N.Y. Aug. 27, 2015) (recommending granting motion to dismiss on false arrest claim notwithstanding the plaintiff's different version of events because that version nonetheless gave rise to probable cause), *report and recommendation adopted*, 2015 WL 5774658 (E.D.N.Y. Sept. 30, 2015); *cf. Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) ("Even where factual disputes exist, as in this case, a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest.").  In light of the allegations, as well as the recordings within the Court's consideration, the Court holds that Laschet had probable cause to effectuate Plaintiff's

seizure; the Court therefore grants Defendants' Motion with respect to Plaintiff's claim against Lashet for wrongful arrest.[14]

### ii.  Mendez

Defendants argue that Mendez also had probable cause to detain Plaintiff and thereafter to transport him.  (Defs.' Mem. 15–17; Defs.' Reply Mem. 1–8.)  Plaintiff rebuts this, asserting that the responding officers lacked probable to initially detain him.  (Pl.'s Mem. 12–24; Pl.'s Sur-Reply 4–7.)  Plaintiff further argues, however, that even if there was probable cause to initially detain him, the responding officers, including Mendez, "lacked probable cause and even arguable probable cause to take Plaintiff into custody and transport him to the hospital."  (Pl.'s Mem. 12.)

Having found that Laschet had probable cause to effectuate Plaintiff's initial detention, the Court extends its findings to Mendez with respect to Plaintiff's initial seizure.  "An arresting officer need not have knowledge of the underlying facts establishing probable cause to make an independent determination of whether probable cause exists—it is enough that the arresting officer be told that there is probable cause for arrest."  *Colon v. City of New York*, No. 11-CV-173, 2014 WL 1338730, at *6 (E.D.N.Y. Apr. 2, 2014) (collecting cases); *see also United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) ("The determination of whether probable cause to arrest

---

[14] Given that "[t]he Court has already found that police had a legitimate defense of probable cause to negate Plaintiffs['s] [§] 1983 claims[,] the Court need not, and declines to, reach the merits of Defendants' qualified immunity defense [with respect to Laschet], since arguable probable cause is a lower standard."  *Walston v. City of New York*, 289 F. Supp. 3d 398, 415 (E.D.N.Y. 2018) (citation omitted), *aff'd*, 754 F. App'x 65 (2d Cir. 2019); *see also Mitchell v. City of New York*, 749 F. App'x 75, 77 (2d Cir. 2019) (summary order) (noting that "arguable probable cause [is] a lesser showing"); *Harley v. City of New York*, No. 14-CV-5452, 2017 WL 4325815, at *6 n.9 (E.D.N.Y. Sept. 27, 2017) ("Because the Court finds that there was probable cause to arrest Plaintiff, it need not reach the question of qualified immunity, as 'arguable probable cause' is a lower standard.").

exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts because the various law enforcement officers in this investigation were in communication with each other.").

Defendants' argument falters, however, with respect to the extension of Plaintiff's confinement and his subsequent transfer to Good Samaritan Hospital.  Plaintiff alleges that after seizing him, the police were unable to find any weapon or firearm of any kind, a chief driver of Laschet's call for a mental health seizure.  (*See* AC Fact Addendum ¶ 15; Defs.' Mem. 12–13 (noting that the fear of a firearm was a driver in the initiation of the mental health seizure); *see also* Pl.'s Mem. 12–16.)  Moreover, Plaintiff alleges that he was fully compliant with the officers' orders throughout his detainment.  (*See* AC Fact Addendum ¶¶ 14–15 (noting that Plaintiff "never resisted and complied with their directives"); Pl.'s Mem. 23.)

Given the procedural posture of the case, the Court must credit Plaintiff's recitation of the facts, *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 613 (S.D.N.Y. 2009) ("When assessing qualified immunity at the motion to dismiss stage, before the benefits of discovery, the Court must take the plaintiff's well-pleaded facts as true."); additionally, "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence," *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).  In this Action, exculpatory evidence would include the police's failure to find a firearm as well as Plaintiff's compliance.  (*See* AC Fact Addendum ¶ 14.)  Accepting Plaintiff's allegations as true, Plaintiff has sufficiently alleged that there was not probable cause to extend the seizure from beyond Plaintiff's initial confinement and take him to the Good Samaritan Hospital given such compliance as well as a lack of a weapon, which was specifically cited as the officers' concern. *Cf. Kerman*, 261 F.3d at 240–41 (reversing the district court's grant of summary judgment in

favor of law enforcement defendants when extending an individual's civil confinement based on a mental health check initiated following a police tip that the individual had a firearm because there existed genuine disputes of material facts giving rise to probable cause or arguing probable cause, in part because it was "significant that the police failed to corroborate the gravamen of [the] 911 call; the officers never found a gun").

The cases to which Defendants cite are unpersuasive, as each was decided at the summary judgment stage with the benefit of evidence not currently before the Court in the instant Action.  In *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003), for example, the Second Circuit affirmed a district court's grant of summary judgment in favor of two police officers who had conducted a mental health seizure of an individual.  *See id.* at 138.  But in that case, the circuit and district courts both had the benefit of discovery and evidence on which to evaluate the officers' actions.  *See id.*  Moreover, the Second Circuit specifically cited "all of the surrounding circumstances known" to the officers.  *Id.*  At this stage in the instant Action, namely prior to discovery (including what will likely be vitally important depositions), the Court cannot determine such surroundings beyond accepting Plaintiff's allegations.

The same is true for *Jones v. New York*, No. 16-CV-556, 2019 WL 4640151 (S.D.N.Y. Sept. 24, 2019).  In that case, then-District Judge Nathan granted summary judgment in favor of officer defendants by relying on "various pieces of information available to the officers at the time of the arrest in turn before considering all of this information as a totality."  *Id.* at *6. Notably, the evidence required to reach this conclusion included the depositions of multiple witnesses regarding their "observations of [the plaintiff's] argumentative, defensive, and irrational behavior, which included raising his voice with the officers" as well as officers'

"observation[s] that [witnesses] were afraid and concerned"—information not available to the Court in at this juncture. *Id.*

The cases Defendants cite in their reply memorandum suffer from similar infirmities, (*see* Defs.' Reply Mem. 5–6): *Panetta v. Crowley*, 460 F.3d 388 (2d Cir. 2006), *Anthony v. City of New York*, No. 00-CV-4688, 2001 WL 741743 (S.D.N.Y. July 2, 2001), and *Batt v. Buccilli*, 725 F. App'x 23 (2d Cir. 2018) (summary order), were each decided at the summary judgment stage with the benefit of discovery such that no facts were in dispute, enabling the courts to determine whether an officer had probable cause. *See Panetta*, 460 F.3d at 397–99 (relying on, in part, written affidavits and additional information gleaned in discovery in deciding to affirm a grant of summary judgment); *Anthony,* 2001 WL 741743, at *5 (relying on the defendant officers' testimony regarding the plaintiff's behavior when determining probable cause for a civil confinement on dangerousness grounds), *aff'd*, 339 F.3d 129 (2d Cir. 2003); *Batt*, 725 F. App'x at 26 (determining qualified immunity where there existed "[n]o genuine dispute" regarding key facts giving rise to arguable probable cause). Defendants are correct that each speaks to the narrowness of *Kerman*'s holding, (*see* Defs.' Reply Mem. 4–5), but because each of these cases—including *Kerman*—rely on evidence not currently in the Court's purview, the upshot of *Kerman*—namely, the existence of disputed facts that preclude a determination of probable cause—remains persuasive. In other words, accepting Plaintiff's allegations as true, the Court is not yet in a position to conclude as a matter of law that there existed probable cause to extend Plaintiff's confinement after he was initially seized.

The Court reaches an identical conclusion based on identical reasoning vis-à-vis whether Mendez had arguable probable cause, which would confer qualified immunity related to extending Plaintiff's detainment. Indeed, "[a]t this stage of the litigation, without the benefit of

discovery and the facts to be gleaned therefrom, the Court declines to decide whether the

Defendants are entitled to qualified immunity." *Doe v. Town of Greenwich*, 422 F. Supp. 3d

528, 538 n.2 (D. Conn. 2019).  Accordingly, the Court denies Defendants' Motion with respect

to Plaintiff's Fourth Amendment claim against Mendez as it relates specifically to Mendez's

actions in extending the mental health seizure beyond his initial confinement.  *See Norman v.*

*Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *12 (S.D.N.Y. July 31, 2020)

("Thus, the [c]ourt will not dismiss [the] [p]laintiff's claim against [one defendant] based on

qualified immunity at this early stage, without the benefit of discovery."); *Doe*, 422 F. Supp. 3d

at 538 n.2; *cf. Bailey v. Pataki*, No. 08-CV-8563, 2010 WL 234995, at *2 (S.D.N.Y. Jan. 19,

2010) ("In its July Opinion this Court denied defendant officials' motion to dismiss plaintiffs'

complaints on the basis of qualified immunity, finding that at that stage of the litigation, without

the benefit of discovery, the Court could not find that defendants were entitled to qualified

immunity as a matter of law; but the Court gave them leave to raise the defense again at the close

of discovery when a more complete factual predicate for making that determination would be

available to the Court.").[15]

## 5.  First Amendment Claims

Defendants contend that Plaintiff's First Amendment claim must be dismissed because

the police had probable cause to detain Plaintiff, and "[w]here police have probable cause to

arrest, there can be no claim for retaliatory arrest under the First Amendment."  (Defs.' Mem.

19.)  Defendants assert, too, that the officers "would be entitled to qualified immunity" for their

---

[15] The Court's holding—namely finding the existence of probable cause and arguable probable cause as a matter of law for the initial seizure but not yet for the extension of Plaintiff's civil confinement—would apply to the unnamed additional responding officers if identified in subsequent pleadings.

actions.  (*Id.*)  Third, Defendants argue that Plaintiff fails to plausibly allege the necessary intent

or motivation to sustain a First Amendment retaliation claim.  (*See id.* at 20.)  Finally,

Defendants argue that Plaintiff fails to allege that his speech was actually chilled.  (*See id.*)

Plaintiff disputes each of these arguments vigorously.  (*See* Pl.'s Mem. 24–29.)

### a.  Applicable Law

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his

speech or conduct was protected by the First Amendment; (2) the defendant took an adverse

action against him; and (3) there was a *causal connection* between this adverse action and the

protected speech.'"  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (emphasis

added) (quoting *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).

With respect to the first *Cox* factor, as the Supreme Court has said, "the First Amendment

protects a significant amount of verbal criticism and challenge directed at police officers."  *City

of Houston v. Hill*, 482 U.S. 451, 461 (1987).  Thus, an individual's "right to criticize the police

without reprisal clearly satisfies the first prong of this test."  *Kerman*, 261 F.3d at 242.  To that

end, the Second Circuit has held that speech directed at police officers is protected unless it is

"likely to produce a clear and present danger of a serious substantive evil that rises far above

public inconvenience, annoyance or unrest."  *Posr v. Court Officer Shield No. 207*, 180 F.3d 409,

415 (2d Cir. 1999) (internal quotation marks and citations omitted).

With respect to the third and final *Cox* factor, causality, the retaliatory motive must be a

"but-for" cause.  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  In other words, "[i]t is not

enough to show that an official acted with a retaliatory motive and that the plaintiff was

injured—the motive must *cause* the injury."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)

(emphasis in original).  For this reason, where a plaintiff asserts a claim of First Amendment

retaliation claim, the complaint "must plead and prove the absence of probable cause for the arrest," as probable cause vitiates the causal element entirely.  *Id.* at 1724.

### b.  Application

Neither Party suggests that civil confinement—the equivalent to an arrest—is not an adverse action, thereby satisfying the second prong.  *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1260 (2022) ("Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment.").  By contrast, Defendants argue the sufficiency of Plaintiff's claims with respect to the first and third *Cox* factors.  Regarding the former, Defendants contend Plaintiff's call to emergency services crossed the threshold from "speech [that] was protected by the First Amendment," *Matthews*, 779 F.3d at 172, to a "true threat," which lies beyond the First Amendment's protections, *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013), (*see* Defs.' Mem. 19–20; Defs.' Reply Mem. 9–10).  Regarding the latter, Defendants charge that Plaintiff fails to allege a causal connection between Plaintiff's statements—assuming arguendo that they are protected—and his arrest.  (*See* Defs.' Mem. 20; Defs.' Reply Mem. 8–9.)

### i.  Laschet

The Court need not determine whether Plaintiff's statements ventured beyond the outer limits of the First Amendment's protections: Plaintiff's First Amendment claim against Laschet falters insofar as he fails to allege a causal nexus between the allegedly retaliatory motive and Defendants' actions where probable cause existed, *see supra* II.B.4.b.i.  *See Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992) (holding that there was no First Amendment violation where arrest and prosecution were supported by probable cause); *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990) (holding that the plaintiff's evidence of retributive motive was

insufficient to raise genuine issue as to impropriety of arrest and prosecution for which defendant had probable cause); *Walsh v. City of New York*, No. 19-CV-9238, 2021 WL 1226585, at *5 (S.D.N.Y. Mar. 31, 2021) ("The existence of probable cause [generally] defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 23 (2d Cir. 2018) (summary order))); *Graziani v. Mulligan*, No. 11-CV-1603, 2012 WL 1565278, at *3 (D. Conn. May 2, 2012) (holding that "the plaintiff's retaliation claims cannot be maintained if the arrest . . . [was] supported by probable cause independent of the defendants' motive" (citing *Singer*, 63 F.3d at 120)).

Beyond probable cause deficiencies, Plaintiff also lacks any allegations of a retaliatory motive against Laschet. Plaintiff effectively concedes that Laschet dispatched the officers because she "misunderstood" Plaintiff's statement, having "thought she heard [Plaintiff] say one thing which was proven false." (AC Fact Addendum ¶ 19.) This is a far cry from having "alleged a retaliatory motive"—such as an officer telling a plaintiff that he would teach "would teach [the plaintiff] a lesson and give [the plaintiff] something to sue for," the very threat made by the police officer in *Kerman*, 261 F.3d at 242—on which Plaintiff asks the Court to rely. Thus, both because Lashet had probable cause to effectuate Plaintiff's seizure and because Plaintiff's failed to allege a retaliatory motive, Defendants' Motion with respect to Plaintiff's First Amendment retaliation claim against Laschet is granted and such a claim is dismissed.

### ii.  Mendez

For the same reasons identified earlier, namely the existence as a matter of law of probable cause, Plaintiff has not adequately pled a violation of his First Amendment rights with respect to his initial seizure. *See supra* II.B.5.i. Moreover, Plaintiff alleges only that Laschet

dispatched Mendez and the other officers seize Plaintiff *solely* because he was a suicide risk.  In other words, Plaintiff does not allege that the officers were ever told of Plaintiff's complaints *before* seizing him.  *See Jeune v. Crew*, No. 16-CV-1107, 2017 WL 4357382, at *12 n.19 (E.D.N.Y. Sept. 29, 2017) ("Even if [the plaintiff's] speech is protected speech, his First Amendment claim nevertheless fails because he fails to allege that the [] [d]efendants had any knowledge of the speech such that the Court could infer retaliatory animus.").  Accordingly, Plaintiff cannot sustain a First Amendment violation against Mendez for the initial seizure, as he cannot retaliate against what he does not know.  *See Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012) (affirming dismissal of a First Amendment claim because the alleged retaliator lacked knowledge of the conduct, as "it is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct" (internal quotation marks omitted)); *Wu v. Metro-North Commuter R.R.*, No. 14-CV-7015, 2015 WL 5567043, at *7 (S.D.N.Y. Sept. 22, 2015) ("[The] [p]laintiff has not pleaded any facts that would suggest that [the] [d]efendant [ ] even had any knowledge of these complaints, rendering baseless any inference that he might have been motivated to retaliate for them.").

The case is not as clear-cut with respect to retaliation that occurred following Mendez's initial seizure of Plaintiff, however.  Construing the complaint broadly and raising its strongest terms and accepting the allegations as true given the Action's current procedural posture, Plaintiff effectively alleges that his confinement was extended as a result of his direct complaints to Mendez.  Defendants do not address this argument, focusing solely on Plaintiff's speech as it relates to his call to Laschet and arguing that the entirety of his confinement lacked a causal connection between the speech and the arrest.  (Defs.' Mem. 19–21.)  Indeed, Defendants go as far as to argue that Mendez cannot be seen as having "[a]cted out of a retaliatory animus"

because Plaintiff makes no allegations to that effect, going as far as to say, "there is no allegation that [the responding officers, including Mendez,] were aware of Plaintiff's complaint." (*Id.* at 20.)  But Mendez—if not Defendants altogether—"has been hoist with his own petard." *United States v. Alexander*, 495 F.2d 552, 553 (2d Cir. 1974).

Plaintiff alleges he made no threats, at any time, or even words that could have been interpreted as threats, including upon the officers' arrival. (*See* AC Fact Addendum ¶ 16 ("AT NO TIME did I ever make suicidal threats against myself or threats against anybody else in this community[.]" (emphasis in original)).)  This necessarily encompasses all statements Plaintiff made once Mendez and others arrived at the scene, including once probable cause and arguable probable cause may have been vitiated.  And in his police report, which the Court may consider, *see supra* I.A, Mendez stated: "[Plaintiff] continued to complain regarding the issuance of the traffic summons and that I was not wearing a mask." (Compl. Ex. 1; Pl.'s Mem. Ex. 1).  Such speech cannot be said to be beyond the First Amendment's protections, *see City of Houston*, 482 U.S. at 461 ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."), satisfying the first prong of Plaintiff's claim.

As it relates to a causal connection, construed broadly, Plaintiff sufficiently alleges a retaliatory motive: because Plaintiff complained to Mendez (as well as the other unnamed officers) about Mendez's conduct, Mendez extended Plaintiff's confinement.  *Cf. Moore v. Parsons*, No. 18-CV-507, 2018 WL 1882858, at *6 (D. Conn. Apr. 19, 2018) (denying a motion to dismiss for a First Amendment retaliation claim where a defendant "allege[d] that upon voicing an intention to 'tell[ ] the lieutenants' and complain" about a prison official's conduct, he faced adverse actions).  That the extension of Plaintiff's confinement happened during and/or immediately following Plaintiff's complaints further "suggests retaliation." *Espinal v. Goord*,

558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.").[16]

Defendants' additional counterarguments do not overcome Plaintiff's allegations.  For example, probable cause is no longer an issue in pleading this causality, as Plaintiff has adequately alleged that there existed no probable cause to extend Plaintiff's confinement following the initial seizure and search.  *See supra* II.B.4.b.ii.  Therefore, probable cause provides no shield for this portion of Plaintiff's First Amendment claim against Mendez.

Defendants' final refuge is the argument that Plaintiff failed to allege that his speech was effectively chilled, thereby nullifying his claim.  (*See* Defs.' Mem. 20.)  This argument fails for multiple reasons.

First, Second Circuit precedent previously suggested that, to sustain a First Amendment claim, it must be that the "defendants' actions effectively chilled the exercise of [a plaintiff's] First Amendment right."  *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).  But after pronouncing the "chilling" standard set forth in *Signoracci*, the Second Circuit clarified that "[c]hilled speech is not the sine qua non of a First Amendment claim," and that "[a] plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation *or that he has suffered some other concrete harm*."  *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015) (emphasis added) (quoting *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)).

---

[16] Again, the second prong is considered having been met because seizure is clearly an adverse action.  *See Houston Cmty.*, 142 S. Ct. at 1260.

The Second Circuit expressly declined to determine whether "allegations of emotional and psychological harm would establish compensable injury in a First Amendment retaliation claim." *Zherka v. Amicone*, 634 F.3d 642, 646–47 (2d Cir. 2011). Other circuits, by contrast, "have 'recognize[d] that in some [First Amendment retaliation] cases 'injury based on embarrassment, humiliation, and emotional distress' is sufficient to be actionable under § 1983." *Doe v. City of New York*, No. 18-CV-670, 2018 WL 3824133, at *13 (E.D.N.Y. Aug. 9, 2018) (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (alterations in original)); *see also Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) ("In certain cases, a public official may also face liability where he retaliated by subjecting an individual to 'embarrassment, humiliation, and emotional distress.'"); *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) ("In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim.").

The Court agrees with Judge Ross's analysis in *Doe*:

> *Dorsett* implicitly characterizes the requirement that a plaintiff show "some injury" as stemming from the requirements for Article III standing. Immediately after stating that "[c]hilled speech is not the sine qua non of a First Amendment claim," the court notes: "A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." This is consistent with the Second Circuit's observation in *Zherka* that "[w]here chilling is not alleged, other forms of tangible harm will satisfy the injury requirement, since 'standing is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling.'" Such language suggests that the Second Circuit now requires private citizens raising First Amendment claims to show only a concrete harm sufficient to constitute an "injury in fact" sufficient for standing.

2018 WL 3824133, at *13 (citations omitted). And as the Supreme Court just recently reaffirmed last year, "[v]arious intangible harms," and particularly "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," can be sufficiently "concrete" so as to confer standing. *TransUnion LLC v. Ramirez*,

141 S. Ct. 2190, 2204 (2021). So, too, does "[e]motional distress meet[] this test—it is the harm underlying the common-law tort of intentional infliction of emotional distress." *Doe*, 2018 WL 3824133, at *14.

In this Action, Plaintiff has pled emotional distress. Plaintiff details, at length, the forms of emotional distress he has experienced as a result, at least in part, of the conduct giving rise to the claims herein. (*See* AC Fact Addendum § IV). Accordingly, Defendants' argument falls far short.

Second, even if Defendants' argument had validity, it would still be found wanting. Other district courts within the Second Circuit have held that simply being arrested "ha[s] an immediate and specific chilling effect on [a] plaintiff in that upon arrest he [is] unable to continue his demonstration and his First Amendment activities [is] cut short." *Lederman v. Adams*, 45 F. Supp. 2d 259, 269 (S.D.N.Y. 1999); *see also Anderson v. City of New York*, 817 F. Supp. 2d 77, 97–98 (E.D.N.Y. 2011) (denying the defendants' motion for summary judgment because "[a] jury could find that [the] plaintiff's arrest and confinement were sufficient to constitute actual chilling of his First Amendment right to speak out against police officers"). Indeed, the Second Circuit addressed this idea—admittedly with slightly different facts—far more bluntly in *Kerman*: "[A]n involuntary [] trip to [a hospital] has an obvious chilling effect." 261 F.3d at 242. Therefore, Plaintiff sufficiently alleges a First Amendment claim against Mendez.[17]

---

[17] As with prior claims, the Court's holding regarding Plaintiff's First Amendment claim against Mendez would apply with equal force to the unnamed additional responding officers if identified.

6.  Due Process Claims

Plaintiff vaguely asserts due process claims, stating that there was "no due process" insofar as the Clarkstown Police "manipulat[ed]" the New York Mental Hygiene Law to take Plaintiff into custody.  (AC Fact Addendum § IV.)  Plaintiff also states that his involuntary confinement, when juxtaposed with the complaints he made against the police department itself, constitute "a clear violation of  . . . due process and a violation of the social contract between the police and the community they serve where the citizen has a duty to pay municipal taxes to fund the police and follow the law and the police have a sworn duty to uphold the rights of the citizenry even when the alleged violator is one of their own."  (AC Fact Addendum ¶ 26.)  The Court interprets Plaintiff's references to due process, in light of their respective contexts, as making both substantive and procedural due process claims.

a.  Substantive Due Process

The principle of substantive due process prohibits certain state actions "regardless of the fairness of the procedures used to implement them."  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotation omitted).  But where a constitutional wrong is alleged and the protection at issue is governed specifically by a constitutional amendment, "that Amendment, not the generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Graham*, 490 U.S. at 395; *see also Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (finding that post-arrest denial of desk appearance ticket cannot support a claim of denial of substantive due process because the Fourth Amendment provides the proper analytical framework).  "As such, there is some conflict within [the Second] Circuit as to whether substantive due process claims can coexist with Fourth Amendment claims in the context of involuntary hospitalizations."  *Matthews v. City of New York*, No. 15-CV-2311, 2016 WL

5793414, at *5 (S.D.N.Y. Sept. 30, 2016) (collecting cases, including comparing two cases—one

from the E.D.N.Y. and one from the S.D.N.Y.—that considered a substantive due process claim

arising from an involuntary civil commitment absent Fourth Amendment discussions with two

cases—also one from E.D.N.Y. and one from S.D.N.Y.—that dismissed substantive due process

claims as duplicative of Fourth Amendment-based claims).

Notwithstanding this tension, the fact that the Second Circuit's precedent regarding

involuntary civil confinement as a substantive due process issue pertains strictly to hospital

personnel, *see Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010), and "[i]n light of the

Supreme Court's prior admonition against creating substantive due process rights where other

Amendments provide relief, the absence of an explicit standard designed for responding

authorities, and the manner in which the garden-variety probable cause analysis under the Fourth

Amendment can defeat a substantive due process claim," the Court is persuaded that substantive

due process claims cannot be brought "against law enforcement officers who bring a person into

a hospital" in the civil confinement context. *Matthews*, 2016 WL 5793414, at *6.

Moreover, the dismissal is even more straightforward insofar as Plaintiff affirmatively

and voluntarily abandoned his Fourteenth Amendment claims, which encompasses Plaintiff's

substantive due process claims. *See Commerzbank AG v. Bank of N.Y. Mellon*, No. 15-CV-

10029, 2017 WL 1157278, at *4 (S.D.N.Y. Mar. 21, 2017) (granting a dismissal where the

"[p]laintiff expressly 'abandon[ed] claims asserted'" (second alteration in original)).  Therefore,

the Court grants Defendants' Motion to the extent it extends to substantive due process claims.

### b.  Procedural Due Process

New York Mental Hygiene Law § 9.41 reads, in full:

Any peace officer, when acting pursuant to his or her special duties, or police
officer who is a member of the state police or of an authorized police department

54

> or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.  Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40 of this article, or pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

NYMHL § 9.41(a).  Importantly, "§ 9.41 does not provide any specific procedure or hearing prior to being transported to a hospital or psychiatric emergency program." *Matthews*, 2016 WL 5793414, at *7.  Accordingly, "individuals cannot assert a procedural due process claim under this statute." *Id.*  Moreover, once again, Plaintiff's affirmative and voluntarily abandonment of his Fourteenth Amendment claims, (Pl.'s Mem. 30), further merits dismissal.  The Court therefore grants Defendants' Motion with respect to any and all procedural due process claims.

### 7.  *Monell* Claims

Finally, Defendants contend that Plaintiff's *Monell* claims, to the extent he makes them, must be dismissed for failure to state a claim.  (Defs.' Mem. 25.)  Again, Plaintiff affirmatively withdrew its claims against the Town.  (Pl.'s Mem. 30.)  Nevertheless, the Court reviews the merits thereof in light of Plaintiff's status and in case Plaintiff wishes to reassert this claim in future pleadings.

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes*, 723 F.3d at 405–06.  However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove:

(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009); *see also Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *report and recommendation adopted sub nom.*, *Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held

responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

Here, the Court can forego the otherwise "necessary" inquiry as to "whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). In this Action, the Court agrees with Defendants that "the [Amended] Complaint is devoid of any allegations concerning municipal policy or custom." (Defs.' Mem. 25.) Accordingly, Plaintiff cannot be said to have plausibly pled a *Monell* claim. *See Sanders v. City of New York*, No. 16-CV-7426, 2018 WL 3117508, at *11 (S.D.N.Y. June 25, 2018) ("[The] [p]laintiff's *Monell* claim must be dismissed for failure to allege a policy, practice, or custom that caused him injury."); *Wheeler v. Wallkill*, No. 16-CV-7441, 2017 WL 2999503, at *5 (S.D.N.Y. July 13, 2017) (dismissing a *Monell* claim where the complaint "makes no mention of any policy or custom in connection with the alleged violations"). Accordingly, Defendants' Motion with respect to all *Monell* claims against the Town of Clarkstown is granted.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is denied in part and granted in part. Specifically, Plaintiff's claims under the Fifth, Sixth, and Fourteenth Amendments as well as his *Monell* claims are dismissed. Plaintiff's First and Fourth Amendment claims against Mendez with respect to the extension of Plaintiff's initial confinement, by contrast, survive. Plaintiff's First and Fourth Amendment claims against Laschet are dismissed.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants

to amend their pleadings" unless "amendment would be futile").  Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein.  The amended complaint will replace, not supplement, the complaint currently before the Court.  It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider, including the identification of individuals and the nature of their involvement.  If Plaintiff fails to abide by the 30-day deadline, the claims that are dismissed could be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 32), and to mail a copy of this Opinion & Order to Plaintiff's address listed on the docket. The Court will hold a Status Conference on October 20, 2022 at 11:30 a.m.

SO ORDERED.

Dated:   September 20, 2022
         White Plains, New York

_____
       KENNETH M. KARAS
    United States District Judge